# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

| | |
|---|---|
| CHARLES MOORE,<br>individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>v.<br><br>DIRECT HOLDINGS AMERICAS INC., doing business as "TIME LIFE,"<br><br>          Defendant. | <u>CLASS ACTION</u><br><br>(JURY TRIAL DEMANDED) |

## CLASS ACTION COMPLAINT

On behalf of himself and all others similarly situated, Plaintiff Charles Moore complains and alleges as follows based on personal knowledge as to himself, the investigation of his counsel, and information and belief as to all other matters, and demands trial by jury. Plaintiff believes that substantial evidentiary support will exist for the allegations in this complaint, after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.      To supplement its revenues, Defendant Direct Holdings Americas Inc., doing business as "Time Life" (hereinafter, "Time Life" or "Defendant"), sells, rents, transmits, and/or otherwise discloses, to various third parties, records containing the personal information (including names and addresses) of each of its customers, along with detailed transactional information revealing the titles and subject matter of the videos, DVDs, and other audiovisual materials purchased by each customer (collectively "Personal Viewing Information"). After Time Life discloses its customers' Personal Viewing Information, the various third-party recipients of this data then append to it a myriad of other categories of personal and demographic data pertaining to Time Life's customers, only to then re-sell that Personal Viewing Information (enhanced with the appended demographic information) to other third parties on the open market.

2.    Plaintiff brings this action for legal and equitable remedies to redress and put a stop to Time Life's practices of intentionally disclosing its customers' Personal Viewing Information in knowing violation of the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

3.    The VPPA clearly prohibits what Time Life has done.  Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent,  any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), inter alia, liquidated damages in the amount of $2,500.00 per violation and equitable relief, *see id.* § 2710(c).

4.    Thus, while Time Life profits handsomely from its unauthorized sale, rental, transmission, and/or disclosure of its customers' Personal Viewing Information, it does so at the expense of its customers' privacy and their statutory rights under the VPPA because Time Life discloses its customers' Personal Viewing Information to third parties without providing prior notice to or obtaining the requisite consent from any of these customers.

5.    Time Life's practice of disclosing its customers' Personal Viewing Information in violation of the VPPA has invaded Plaintiff's and the other unnamed Class members' privacy and resulted in a barrage of unwanted junk mail to their home addresses and e-mail inboxes.  Time Life's disclosures are also dangerous because they allow for the targeting of particularly vulnerable members of society.  For example, as a result of Time Life's disclosures of Personal Viewing Information, any person or entity could buy a list with the names and addresses of all women in the United States who, over the past 12 months, have spent more than $50.00 purchasing DVD collections of the Johnny Carson television show from Time Life. Such a list is available for sale for approximately $154.00 per thousand customers listed.

6.    In an era when the collection and monetization of consumer data proliferates on an unprecedented scale, it's important that companies are held accountable for the exploitation of their customers' sensitive information. Time Life chose to disregard Plaintiff's and thousands of other consumers' statutorily protected privacy rights by releasing their sensitive data into the data-

aggregation and brokerage marketplace. Accordingly, on behalf of himself and the putative Class defined below, Plaintiff brings this Complaint against Time Life for intentionally and unlawfully disclosing his Personal Viewing Information, *en masse*, in violation of the VPPA.

## JURISDICTION AND VENUE

7. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

8. Personal jurisdiction and venue are proper because Defendant is registered to, and regularly does, conduct business in Florida and within this District, including entering into transactions with consumers in Florida and within this District; because a substantial part of the unlawful conduct giving rise to Plaintiff Moore's claims occurred in, was directed to, and/or emanated from within Florida and this District; and because Plaintiff Moore resides within this District.

## PARTIES

9. Plaintiff Moore is, and at all times alleged herein was, a natural person and citizen of Okeechobee, Florida. During the relevant time period, including the two years preceding the filing of this action, Plaintiff Moore purchased numerous videos in DVD format from Time Life.

10. Defendant Direct Holdings Americas Inc., doing business as Time Life, is a Delaware corporation with its principal place of business in Fairfax, Virginia. Time Life does business throughout Florida and across the United States. "Time Life is one of the world's pre-eminent creators and direct marketers of unique music and video/DVD products," which Time Life sells to consumers on its website, over the phone, and through postal mail, among other direct retail sales channels.[1]

## VIDEO PRIVACY PROTECTION ACT

11. In 1988, leading up to the VPPA's enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal

---

[1]     "About Us," Direct Holdings Americas Inc., *available at* https://timelife.com/pages/about (last accessed October 12, 2019).

CLASS ACTION COMPLAINT

information without having any control over where that information goes." *Id.* Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

12.     In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

13.     While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[2]

---

[2]     The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

14.     One former senator may have summarized it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[3]

15.     In this case, however, Time Life chose to deprive Plaintiff and the unnamed Class members of that right by systematically disclosing their Personal Viewing Information to various third parties, without providing notice to (let alone obtaining consent from) anyone, as explained in detail below.

## BACKGROUND FACTS

### I.      Consumers' Personal Information Has Real Market Value

16.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[4]

17.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[5]

18.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount
> of information collected by businesses, or why their information

---

[3]     Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, frank.senate.gov (Jan. 31, 2012).

[4]     FCC, *The Information Marketplace* (Mar. 13, 2001), at 8-11, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.
[5]     *See Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html     (last visited May 13, 2019).

CLASS ACTION COMPLAINT

may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[6]

19.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[7]

20.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[8]

21.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[9]

22.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of

---

[6]     Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[7]     *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited May 13, 2019).

[8]     N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of- consumer-database-marketing.html (last visited May 13, 2019).

[9]     Letter from Sen. J. Rockefeller IV, Sen. Cmtee. on Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c.

hundreds of millions of American citizens raises a number of serious privacy concerns.[10]

23.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[11] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Time Life share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[12]

24.     Disclosures like Time Life's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[13] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[14]

25.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Time Life's are particularly

---

[10]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

[11]     *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited May 13, 2019).

[12]     C. Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times (May 20, 2007), *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited May 13, 2019).

[13]     *Id.*

[14]     *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf.

CLASS ACTION COMPLAINT

troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[15]

26.     Time Life is not alone in violating its customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer and subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in publishing industries.  Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

## II.     Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

27.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding their personal information.

28.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[16]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[17]

29.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

---

[15]     *Id.*
[16]     *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited May 13, 2019).

[17]     *Id.*

CLASS ACTION COMPLAINT

30.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[18]

31.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[19]

32.     Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[20]  As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### III.     Time Life Unlawfully Sells, Rents, Transmits, And Otherwise Discloses Its Customers' Personal Viewing Information

33.     Time Life maintains a vast digital database comprised of its customers' Personal Viewing Information, including the names and addresses of each customer and information reflecting the titles of all movies, television shows, and other audio-video materials in video and DVD format that each of its consumers have purchased.

---

[18]     *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited May 13, 2019).

[19]     *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited May 13, 2019).

[20]     *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited May 13, 2019) ("It is obvious that people value online privacy.").

34.     During the time period relevant to this action, Time Life has monetized this database by renting, selling, or otherwise disclosing its customers' Personal Viewing Information to data aggregators, data miners, data brokers, data appenders, and other third parties.

35.     These factual allegations are corroborated by publicly available evidence. For instance, as shown in the screenshot below, the Personal Viewing Information of 134,844 Time Life "DVD/VIDEO Buyers" residing across the United States is offered for sale on the website of NextMark Inc. ("NextMark") – one of many traffickers of this type of Personal Viewing Information – at a base price of "$105.00/M [per thousand records]" (10.5 cents each):



# TIME LIFE DVD/VIDEO MASTERFILE Mailing List

Time Life is one of the world's pre-eminent creators and direct marketers of unique music and video/DVD products. The company specializes in creating distinctive multi-media collections that evoke memories of yesterday, capture the spirit of today, and can be enjoyed for a lifetime.

[ Get Count ]  [ Get Pricing ]  [ Get More Information ]

| SEGMENTS | COUNTS THROUGH 07/31/2019 | |
|---|---|---|
| TOTAL UNIVERSE / BASE RATE | 139,844 | $105.00/M |
| 3 MONTH DVD/VIDEO BUYERS | 17,345 | + $16.00/M |
| 6 MONTH DVD/VIDEO BUYERS | 37,549 | + $10.00/M |
| 12 MONTH DVD/VIDEO BUYERS | 139,844 | + $5.00/M |
| FUNDRAISING RATE | | $75.00/M |
| PUBLISHING RATE | | $95.00/M |
| COMPETITIVE SURCHARGE | | + $25.00/M |

| | |
|---|---|
| POPULARITY: | ===== 100 |
| MARKET: | CONSUMER |
| CHANNELS: | 🖥 |
| SOURCE: | DIRECT RESPONSE |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA |
| GENDER: | 55% FEMALE 40% MALE |

**DESCRIPTION**

Time Life is the world's pre-eminent creator and direct marketer of unique music and video/DVD products. The company specializes in creating distinctive multi-media collections that evoke memories of yesterday, taking their customers back in time… to the Good Old Days!!!

It is okay to admit it, we have all reached that point in our lives, thinking back to when life was a little bit simpler, a little bit more enjoyable, makes you want to smile. Time Life customers have found that smile again!!!

**TIME LIFE**®

**PURCHASE DATA**

- 85% are New To File Buyers.

- 100% are Paid Buyers, with over 60% preferring 1-pay over payment options

- The music categories range from Country to Classic Rock, Motown to Christian, Sock Hop to Woodstock, and any other music genre that will take you back to your younger years

- The video collections are from iconic TV variety shows like Johnny Carson, Red Skelton and Ed Sullivan, to classics like Carol Burnett, Hee Haw and Wonder Years.

| SELECTS | |
|---|---|
| $100.00+ BUYERS | $20.00/M |
| $150.00+ BUYERS | $22.00/M |
| $50.00+ BUYERS | $16.00/M |
| $75.00+ BUYERS | $18.00/M |
| 3RD PARTY BLOW-IN | $10.00/M |
| GENDER | $8.00/M |
| NEW TO FILE | $12.00/M |
| PRODUCT | $12.00/M |
| SCF/ZIP/STATE | $8.00/M |
| SOURCE | $12.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | PLEASE INQUIRE |
| EMAIL | $55.00/F |
| FTP | $70.00/F |

**RELATED LISTS**

📄 I-BEHAVIOR DATABASE
📄 MEREDITH DATABASE - MASTERFILE
📄 HELPING HANDS CHARITABLE DONORS
📄 ALLIANT CONSUMER AUDIENCES - MODELING
📄 PUBLISHERS CLEARING HOUSE MERCHANDISE BUYERS
📄 HARRY & DAVID MAIL ORDER BUYERS
📄 FORBES
📄 WILLIAMS-SONOMA, INC. THE UNIVERSE FILE - ENHANCED
📄 DIRECT CHECKS MEGAFILE CURRENT / LILLIAN VERNON / COLORFUL IMAGES COMBINED MASTERFILE

©2016 Direct Holdings Americas Inc. TIME LIFE and the TIME LIFE logo are registered trademarks of Time Warner Inc. and affiliated companies. Used under license by Direct Holdings Americas Inc., which is not affiliated with Time

https://lists.nextmark.com/market?page=order/online/datacard&id=311208

*See* **Exhibit A** hereto.

36.     The "TIME LIFE DVD/VIDEO MASTERFILE Mailing List" list offered for sale by NextMark, shown in the screenshot above, contains Personal Viewing Information for each of

the 139,844 American consumers whose information appears on the list, including each person's name, postal address, e-mail address, and gender, as well as the particular Time Life products each person purchased (i.e., titles of the purchased DVDs and videos) and the amount of money each person spent on those purchases.

37.     As a result of Time Life's data compiling and sharing practices, companies have obtained and continue to obtain the Personal Viewing Information of Time Life's customers, together with additional sensitive personal information that has been appended thereto by data appenders and others.

38.     Plaintiff are informed and believe, and thereupon allege, that numerous of the third parties to whom Time Life has transmitted and/or otherwise disclosed its customers' Personal Viewing Information, either directly or indirectly through an intermediary or intermediaries, have in turn sold, rented, transmitted, or otherwise disclosed that Personal Viewing Information (together with other sensitive personal demographic and lifestyle information appended thereto by data appenders and other entities) to other third parties, including other data brokers, data miners, data appenders, and marketing companies.

39.     Time Life's disclosures of Personal Viewing Information have put its customers at risk of serious harm from scammers.  For example, as a result of Time Life's disclosures of Personal Viewing Information, any person or entity could obtain a list with the names and addresses of all women in the United States who, over the past 12 months, have spent more than $50.00 purchasing DVD collections of the Johnny Carson television show from Time Life.  Such a list is available for sale for approximately $154.00 per thousand customers listed.

40.     Time Life does not seek its customers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its customers remain unaware that their Personal Viewing Information and other sensitive data is being sold, rented and exchanged on the open market.

41.     By disclosing its customers' names, addresses, and detailed video purchase information – which can collectively "reveal intimate facts about our lives"[21] – Time Life has intentionally and knowingly disclosed its customers' Personal Viewing Information to third parties without their informed written consent, in direct violation of the VPPA.

### PLAINTIFF'S EXPERIENCE

42.     Plaintiff Moore has on numerous occasions, including during the past 24 months, purchased movies, television shows, and/or other videos in DVD format directly from Time Life on the Time Life website.

43.     Prior to and at the time he purchased each of these videos from Time Life via its website, Time Life did not notify Plaintiff Moore that it would disclose the Personal Viewing Information of its customers generally or of Plaintiff Moore in particular, and Plaintiff Moore has never consented, agreed, authorized, or otherwise permitted Time Life to disclose his Personal Viewing Information to third parties.  Plaintiff Moore has never been provided any written notice that Time Life sells, rents, licenses, exchanges, or otherwise discloses its customers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information.

44.     Time Life nonetheless sold, rented, transmitted and/or otherwise disclosed, either directly or through an intermediary or intermediaries, Plaintiff Moore's Personal Viewing Information – including, inter alia, his full name, postal address, e-mail address, the titles of the videos he purchased from Time Life, and the amount of money he spent on each such purchase – to data miners, data appenders, data aggregators, marketing companies, and/or other third parties, including without limitation NextMark, during the relevant time period.

45.     Plaintiff Moore is informed and believes, and thereupon alleges, that third parties to whom Time Life transmitted and/or otherwise disclosed his Personal Viewing Information, including without limitation NextMark, have in turn sold, rented, transmitted, and otherwise

---

[21]     California's Reader Privacy Act Signed into Law, EFF (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited May 14, 2019).

disclosed his Personal Viewing Information (together with other sensitive personal demographic and lifestyle information appended thereto by data appenders and other entities) to other third parties, including but not limited to other data brokers, data miners, data appenders, and marketing companies.

46. As a result of Time Life's sales, rentals, transmissions, and/or other disclosures of Plaintiff Moore's Personal Viewing Information to third parties, Plaintiff Moore now receives junk mail from various companies and other organizations that do not offer products or services through the mail. These unwarranted and harassing junk mailings, which are attributable to Time Life's unauthorized sale, rental, and/or other disclosure of his Personal Viewing Information, have wasted Plaintiff Moore's time, money, and resources.

47. Because Plaintiff Moore is entitled by law to privacy in his Personal Viewing Information, and paid money for the videos he purchased from Time Life, Time Life's disclosure of his Personal Viewing Information deprived Plaintiff Moore of the full set of benefits to which he was entitled as a part of his purchases, thereby causing him economic harm. Accordingly, what Plaintiff Moore received (videos without statutory privacy protections) was less valuable than what he paid for (video with statutory privacy protections), and he would not have been willing to pay as much, if at all, for the videos he purchased from Time Life had he known that Time Life would disclose his Personal Viewing Information. Plaintiff Moore did not discover that Time Life sold, rented, transmitted, and/or otherwise disclosed his Personal Viewing Information until September 2019.

## CLASS ACTION ALLEGATIONS

48. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of himself and a class of similarly situated residents (the "Class"), defined as follows:

> All persons in the United States who, at any time during the applicable statutory period, had their Personal Viewing Information disclosed to a third party by Time Life.

49.     Excluded from the Class is any entity in which Time Life has a controlling interest, and officers or directors of Time Life.

50.     Members of the Class are so numerous that their individual joinder herein is impracticable, as they number, on information and belief, in the hundreds of thousands. The precise number of members of the Class and their identities are unknown to Plaintiff at this time, but such information may readily be determined through discovery. Members of the Class may be notified of the pendency of this action by mail and/or publication through the distribution records of Time Life.

51.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the Class. Common legal and factual questions include, but are not limited to: (1) whether Time Life unlawfully disclosed and continues to unlawfully disclose Plaintiff's and the Class's Personal Viewing Information in violation of the VPPA; (2) whether Time Life's disclosures were committed knowingly; (3) whether Time Life obtained the requisite consent before disclosing Plaintiff's and the Class's Personal Viewing Information; (4) whether Time Life was unjustly enriched by its disclosures of Plaintiff's and the Class's Personal Viewing Information; and (5) whether Time Life violated Plaintiff's and the Class's rights to privacy.

52.     The claims of the named Plaintiff are typical of the claims of Class in that Plaintiff, like all unnamed Class members, sustained damages as a result of Time Life's uniform wrongful conduct in disclosing his Personal Viewing Information.

53.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

54.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the members of the Class. Individual members of the Class may lack

the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Time Life's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Time Life's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

### CLAIMS FOR RELIEF

#### FIRST CLAIM FOR RELIEF
#### VIOLATION OF THE VPPA (18 U.S.C. § 2710)
#### (Brought by Plaintiff, Individually and
#### on Behalf of the Class, Against Time Life)

55.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

56.     Time Life is a "video tape service provider as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery or prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as it sells and delivers prerecorded videos and DVDs (i.e., "similar audio visual materials" under the VPPA's definition) of movies, television shows, and other multimedia titles to consumers across the United States, including via its website.

57.     The videos and other DVDs sold by Time Life and purchased by Plaintiff and the Class members constitute "audio visual materials" that are "similar" to "prerecorded video cassette tapes" within the meaning of 18 U.S.C. § 2710(a)(4).

58.     Plaintiff is a "consumer" as defined by the VPPA because he "purchase[d]  . . . goods," i.e., prerecorded videos and DVDs, "from [Time Life,] a video tape service provider," 18

U.S.C. § 2710(a)(1), on multiple occasions over the past several years, including during the 24-month period preceding the filing of this action.

59.     At various times relevant to this action, including subsequent to each of Plaintiff's purchases of video and DVD products from Time Life, including such purchases made within the preceding 24-month period, Time Life disclosed Plaintiff's Personal Viewing Information, including Plaintiff's name and address and records identifying him as a purchaser of particular titles, genres, and subject matters of Time Life videos and DVDs, to various third parties, including data aggregators, data appenders, and marketing companies, including without limitation NextMark.

60.     Time Life's disclosures of Plaintiff's Personal Viewing Information to third parties, including without limitation to NextMark, constituted "knowing[] disclosures" of "personal identifiable information concerning [Plaintiff]" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(b)(1).

61.     Plaintiff and the members of the Class never consented, in writing or otherwise, expressly or otherwise, to Time Life disclosing their Personal Viewing Information to anyone. Worse yet, Plaintiff and the members of the Class did not even receive notice before Time Life disclosed their Personal Viewing Information to third parties.

62.     Time Life's disclosures of Plaintiff's and the Class's Personal Viewing Information were not made pursuant to lawful compulsion. Nor were Time Life's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Time Life's disclosures were not necessary for "debt collection activities, order fulfillment, request processing, [or] the transfer of ownership." 18 U.S.C. § 2710(a)(2).

63.     Time Life's disclosures of Plaintiff's and the Class's Personal Viewing Information were made to various third parties – including, but not limited to, data aggregators, data appenders, data cooperatives, direct-mail advertisers, marketers, other third parties, and anyone else willing to pay for it – in order to increase Time Life's corporate revenues.

64.     Third-party recipients of Plaintiff's Personal Viewing Information, disclosed to them by Time Life, thereafter appended to Plaintiff's Personal Viewing Information additional categories of sensitive information from their own databases and re-disclosed this "enhanced" Personal Viewing Information to other third parties, including on behalf of Time Life.  Because the lists of Personal Viewing Information disclosed by Time Life and redisclosed by other downstream entities on its behalf included additional information appended by data aggregators and appenders, these "enhanced" lists of Personal Viewing Information were more valuable, and Time Life and the other third-party traffickers of such data were able to increase their profits gained from the rentals and/or exchanges of such lists, including those containing Plaintiff's and the Class's Personal Viewing Information.  The following screenshot shows one data broker offering for sale an "enhanced" list of Time Life customer data:



*See* **Exhibit B** hereto.

65. By disclosing Plaintiff's and the Class's Personal Viewing Information, Time Life violated Plaintiff's and the Class's statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

66. Time Life's disclosures of Plaintiff's Personal Viewing Information to third parties has also caused an influx of third-party print advertisements and e-mail spam to Plaintiff's postal mailboxes and e-mail inboxes.

67. Additionally, because Plaintiff and the members of the Class paid Time Life for the videos they purchased from Time Life, and because Time Life was obligated to comply with the VPPA, Time Life's unlawful disclosure of Plaintiff's and the other Class members' Personal Viewing Information deprived Plaintiff and the Class members of the full value of their paid-for videos. Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Viewing Information, Time Life's unlawful sales, rentals, transmissions, and/or other disclosures of their Personal Viewing Information caused them to receive less value than they paid for, thereby causing them economic harm. Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Viewing Information, a purchase of videos from Time Life that includes privacy protections for their Personal Viewing Information is more valuable than one that does not. Accordingly, had Plaintiff been adequately informed of Time Life's disclosure practices, he would not have been willing to purchase the videos that they bought from Time Life at the prices charged, if at all. Thus, Time Life's unlawful disclosures caused Plaintiff economic harm.

68. As a result of Time Life's unlawful disclosures of their Personal Viewing Information, Plaintiff and the members of the Class have suffered privacy and economic injuries. On behalf of himself and the Class, Plaintiff seeks: (1) an injunction requiring Time Life to obtain consent from its customers prior to disclosing their Personal Viewing Information as required by the VPPA, 18 U.S.C. § 2710(c)(2)(D); (2) $2,500.00 per violation of the VPPA to Plaintiff and

Class members, and punitive damages in an amount to be determined at trial, *id.* § 2710(c)(2)(A)-(B); and (3) costs and reasonable attorneys' fees pursuant to the VPPA, *id.* § 2710(c)(2)(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Charles Moore seeks a judgment against Time Life, individually and on behalf of all others similarly situated, as follows:

A.      For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class.

B.      For an order declaring that Time Life's conduct as described herein violates the federal VPPA, 18 U.S.C. § 2710(c)(2)(D);

C.      For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.      For Time Life to pay $2,500.00 to Plaintiff and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

E.      For punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

F.      For prejudgment interest on all amounts awarded;

G.      For an order of restitution and all other forms of equitable monetary relief;

H.      For injunctive relief as pleaded or as the Court may deem proper; and

I.      For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C).

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Class, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all claims so triable.

Dated: November 6, 2019                    Respectfully submitted,

                                           By: /s/ Frank S. Hedin
                                                  Frank S. Hedin

                                           **HEDIN HALL LLP**
                                           FRANK S. HEDIN (State Bar No. 109698)

CLASS ACTION COMPLAINT

1395 Brickell Ave, Suite 1140
Miami, Florida 33131
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
E-Mail: fhedin@hedinhall.com

**HEDIN HALL LLP**
DAVID W. HALL*
Four Embarcadero Center, Suite 1400
San Francisco, California 94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058
E-Mail: dhall@hedinhall.com

**BURSOR & FISHER, P.A.**
SCOTT A. BURSOR (State Bar No. 68362)
2665 S. Bayshore Dr., Suite 220
Miami, Florida 33133
Telephone: (305) 330-5512
E-Mail: scott@bursor.com

**BURSOR & FISHER, P.A.**
JOSEPH I. MARCHESE*
PHILIP L. FRAIETTA*
888 Seventh Avenue
New York, New York 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com
          pfraietta@bursor.com

* *Pro Hac Vice* Application Forthcoming

*Counsel for Plaintiff and Putative Class*